**J.S. and T.S., parents of C.S., Plaintiffs,**

**v.**

**SHORELINE SCHOOL DISTRICT, Defendant.**

**No. C01–1527R.**

United States District Court, W.D. Washington, at Seattle.

June 21, 2002.

Charlotte Cassady, Seattle, WA, for Plaintiffs.

James J. Dionne, Timothy Shawn McCredie, Seattle, WA, for Defendant.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

ROTHSTEIN, District Judge.

On August 31, 2001, Administrative Law Judge Jill L. Geary issued an order finding that parents J.S. and T.S. were not entitled to reimbursement under the Individuals with Disabilities Education Act for the placement of their child, C.S., at a residential school in Montana. The parents filed the present action under 20 U.S.C. § 1415(i)(2)(A), seeking review of that decision. Having reviewed the administrative record, the ALJ's findings of fact, conclusions of law and order ("FFCL"), and the parties' briefs, the court hereby finds and rules as follows:

## I. FACTUAL BACKGROUND

### A. *Sixth and Seventh Grade*

In the fall of 1997, parents J.S. and T.S. enrolled their son C.S. in the sixth grade at Lake Forest Elementary School. The family had previously lived in England and had recently returned to the United States.

Shortly after starting the sixth grade, C.S. was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and was put on medication. The parents sought the diagnosis after receiving comments from C.S.'s teachers that he was having difficulty paying attention in class and finishing tasks. C.S.'s grades, mostly Bs and Cs, reflected his failure to turn in homework assignments even after he began receiving help from a private tutor. There was also some evidence that C.S. was having passive behavior problems, including refusing to perform tasks, disregarding instructions of school authorities, and having difficulties forming friendships with his peers. Sometime at the beginning of 1998, the district was notified of C.S.'s ADHD diagnosis. In March 1998, the school convened a meeting to provide the parents an opportunity to discuss and attempt to remediate C.S.'s academic problems. Although as a result of the meeting the school provided special study halls and assignments and made a variety of recommendations concerning his instruction, C.S. was not referred for special education at that time. District officials testified before the ALJ that the referral was not made in part because testing during C.S.'s sixth grade year revealed that he was at or above grade levels in all tested areas.

The following year, C.S. entered seventh grade at Kellogg Middle School. C.S.'s performance continued to decline, and he received mostly Ds and Fs, grades that were again based principally on his failure to turn in assigned work. Although records reflect C.S.'s difficulties cooperating with his peers and resistance to teacher instruction, C.S. did not appear to pose any exceptional disciplinary problems in school. Again the school did not recommend C.S. to a special education program. District officials testified that C.S.'s grades and standardized test scores were not exceptional and did not indicate he had a particular need for a special education assignment.

### B. *Home Behavior Problems*

Meanwhile, C.S. was posing increasingly difficult disciplinary problems at home. During sixth grade he had an explosive temper tantrum that spurred the parents to seek anger management counseling for him. By seventh grade, he had grown larger than his mother, who was suffering from a medical condition[1] that further

---

1. The record reflects that the mother suffered

from a back problem induced by a childhood

made it difficult for her to discipline and control him.

Throughout his middle school years, his behavior grew increasingly defiant. He broke into his mother's home computer and downloaded pornography, which he told his parents he sold at school. He continued to refuse to do his homework when told, ignored his parents' requests not to watch television, and eventually even posed a physical threat to his mother, knocking her down when she tried to discipline him. At one point it came to his parents' attention that he might be experimenting with marijuana. C.S. allowed other kids into the house, enabling them to steal his mother's jewelry. He threatened to run away from home and bragged to his special education counselor that he had met a man on the internet that he planned on moving in with. Eventually the parents filed an At–Risk–Youth Petition, a judicial mechanism intended to provide parents of children with disciplinary problems an alternative third-party authority figure. This approach ultimately failed. Despite the increasing frequency and seriousness of these episodes, the ALJ found that there was little evidence that C.S. exhibited more than what the district believed were relatively routine disciplinary problems at school,[2] or that the school district officials were notified of C.S.'s difficulties at home during his middle school years, or that they were alerted that he was having some difficulties with his medications, or that he had been diagnosed during the

seventh grade with Oppositional Defiant Disorder ("ODD") and later was given a possible diagnosis of bipolar mood disorder.

C. *Eighth Grade, Development and Implementation of the First IEP, and the Events Leading up to C.S.'s Withdrawal from the District*

At the beginning of C.S.'s eighth grade year, the parents contacted a private education consultant, who advised them of their rights under the Individuals with Disabilities Education Act ("IDEA"). On October 25, 1999, the parents had a meeting with school officials to discuss the proper course of action. The school proceeded in an evaluation of C.S., administering standardized tests, conducting classroom observation, and giving C.S. a vision and hearing exam.

There is conflicting testimony as to the process by which the district requested and received confidential information from C.S.'s private doctors and counselors. The parents did sign an authorization for release of the information, but specifically declined to authorize release of information for Dr. Newlyn, the doctor who had recently diagnosed C.S. with ODD. It is unclear whether the district requested information from the various service providers whom the parents had authorized. In any event, only C.S.'s psychiatrist, Dr. Knutson, sent any information to the district. Dr. Knutson's report indicated that C.S. had been diagnosed with ADHD, but

injury, for which she was in and out of the hospital, sometimes for days at a time, during much of the time period at issue in this case.

**2.** The ALJ noted that "[p]rior to eight grade, the student had never been formally disciplined for his behaviors. In the eighth grade, the student did have several discipline incidents. He received a timeout in September for disruptive behavior and one in October for insubordination. In February, the student

was written up for two incidents on the school bus, one where he was blowing straight pins out a straw (no one was hurt) and one where he used unacceptable language and slashed the bus seat after being reprimanded. However, overall his behavior in the classroom did not draw attention from the teaching staff. To the extent that the student acted out, he almost always directed these behaviors towards his parents." FFCL at 20.

did not mention C.S.'s ODD diagnosis because, he testified, he did not want the student to be "labeled" and only remitted the information he thought the school needed. The ALJ found that regardless of whether the district sent out the initial information requests, it did not continue to pursue the confidential information from any of C.S.'s other service providers.[3]

On February 7, 2000, the school issued the Summary Analysis of Evaluation Data. That report summarized the district's observations, concluded that C.S. qualified for special education services under the handicapping condition of "health impaired," and recommended a "directed studies program," which included tutoring in math and organization skills. The report noted that manifestations of the student's ADHD included difficulty paying attention in the classroom. The report made no mention of C.S.'s ODD diagnosis or behavioral problems at home. The parents signed the report, indicating their approval of its conclusions.

On March 24, 2000, the district completed the first Individualized Education Program ("IEP") recommendation, a central requirement of the IDEA that charges a school district with an obligation to develop a personalized course of study for a student identified as learning disabled. The IEP noted C.S.'s ADHD diagnosis, difficulties in task completion, and a need for remedial math and organizational in-

struction. The IEP had initially recommended 50 minutes a day of specialized instruction, to begin immediately. C.S.'s parents and his private education consultant requested a modification of the IEP, however, to include only 25 minutes a day of instruction, to begin several weeks later at the beginning of the year's last trimester. C.S.'s parents rationalized the reduction of special education hours and delay in the implementation of the program as less disruptive to C.S.'s schooling, and the district conceded the adjustments. The IEP also made recommendations for improving C.S.'s organizational habits, including a recommendation that C.S. use a notebook with dividers and write down assignments in a daily planner. C.S. was also given permission to take extra time for large assignments, and to use a laptop for assignments, a calculator in math, and a tape recorder for class lectures. The IEP set out various goals and objectives and put in place a procedure for monitoring C.S.'s progress. The IEP, like the Summary Analysis that preceded it, did not include any special behavioral plan, because no behavior problems were noted. The parents signed the finalized plan, indicating their approval.

C.S. received instruction pursuant to this IEP for approximately two months, from the beginning of eighth grade's final trimester until May 26, 2000. Although

---

**3.** The ALJ found that the school would have obtained information about C.S.'s behavior problems had it pursued information from other service providers, finding that "[t]he additional information [from other providers] would have confirmed the parents' current position that the student was having behavior problems at home, although at the time, the parents were not disclosing the extent of the problems to the district." FFCL at 17. The ALJ later states, however, that "given Dr. Knutson's reluctance to share information with regard to his diagnosis that the student had ODD, it is unclear how helpful pursuing

further information from him would have been." *Id.* at 65. The court finds the evidence inconclusive as to whether other service providers would have made the same judgment that Dr. Knutson did, and chosen not to share information that they believed might have been used to "label" C.S. or would otherwise not have been helpful to school officials. It therefore cannot be determined with any certainty whether the school officials would have obtained information about C.S.'s home disciplinary problems even had they succeeded in soliciting information from his other service providers.

during an April meeting C.S.'s father and the special education instructor Dave Ostrer indicated satisfaction with the new instruction under the IEP, C.S.'s mid-trimester grades reported that C.S. was failing all his classes.

In mid-May, feeling that the IEP was not having the desired results, C.S.'s father requested a meeting with the district. Although the parties gave conflicting testimony before the Administrative Law Judge, she found that the father had contacted Dave Ostrer, the school's special education official, to request his presence at another meeting to discuss C.S.'s performance under the IEP and any appropriate adjustments thereto, and C.S.'s anticipated enrollment at Shorecrest High School. A meeting was held at Shorecrest on May 24, 2000. Neither Ostrer, nor any other Kellogg Middle School staff, attended the meeting. The meeting was attended by C.S.'s father, the family's private education consultant, and Shorecrest's school psychologist, its counselor, and the co-chair of the school's Directed Studies Program.

There was some question before the ALJ whether that meeting was intended to be an official IEP meeting or not. The parents testified that that was their intent; district officials testified that they did not understand it to be so, and that they believed the meeting was held in response to a routine parental request to discuss a student's transition to high school. In particular, C.S.'s father sought an opportunity to discuss the possibility of a half-day home schooling/high school electives hybrid he had conceived for his son. In any event, it is undisputed that the meeting did not meet the IDEA-mandated procedural requirements of an official IEP meeting.

At the conclusion of the meeting, it appeared that the district had convinced the father that his home schooling idea would not be best for C.S. During the meeting,

C.S. himself also spoke up and noted that he intended to try harder at Shorecrest, expressing his belief that high school "counted." School officials described to the father the nature of the program he and his son could anticipate at Shorecrest, which included a study skills program and other remedial instruction. School officials concluded by recommending that C.S.'s current IEP remain in place, with the possibility of developing a more restrictive environment in the event C.S. did not improve his grades. Despite what he later reported as disappointment with the meeting, C.S.'s father did not express any dissatisfaction at this conclusion, and did not mention any intent, inchoate or otherwise, to send C.S. to a private residential school. The father also continued to remain silent on issues concerning C.S.'s home disciplinary problems, his continuing difficulty with his ADHD medications, or his recent working diagnosis of possible bipolar mood disorder. School officials were left with the impression that they had addressed the father's concerns, and that C.S. would enroll at Shorecrest in the fall.

Two days later, with the school's permission, the parents removed C.S. from the eighth grade, several weeks before the end of the term, to place him in a three-week wilderness program, a plan the father had not mentioned at the meeting two days earlier. The parents testified that at the time they withdrew their son from eighth grade, they intended to return him to the district to attend Shorecrest High School in the fall. Within 24 hours of his return, however, C.S. assaulted his mother and the police were called. His parents testified that at that point they concluded that the outdoor program had not had the desired effect on his behavior at home. As a result, they testified, they decided in July or August to place him in an out-of-state residential school, Montana Academy. On

August 16, 2000, the parents notified the district in a letter written by their attorney that they were pulling their son out of the district and placing him in a private residential school, and that they would be seeking reimbursement.

## D. Second IEP Meeting and IEP

On August 31, 2000, the district convened an IEP meeting. Present at this meeting were counselors, teachers, special education instructors, and other school officials from both Kellogg Middle School and Shorecrest High School. Also present was the parents' attorney. Although the father conceded that he had not expressed any dissatisfaction at the May 2000 meeting, the parents conveyed to the district that they had come to believe that mere maintenance of the current IEP in the high school setting would not have the desired results, and that they had grown frustrated with what they perceived to be the continuing inability of the district to address their son's problems. At the meeting, the parents noted that their son's behaviors were becoming worse, and discussed his ODD and working bipolar mood disorder diagnosis. Much of the information concerning C.S.'s behavioral problems at home were revealed for the first time to the district during this meeting.

The district decided at that meeting to perform a comprehensive evaluation of C.S., which again revealed the ADHD. The evaluation also revealed C.S.'s ODD, possible developing narcissistic personality characteristics, and a low-grade depression. Although C.S. was not scheduled to begin Montana Academy until later in the fall, his parents refused to allow him to return to the district school or to present C.S. to the district for further behavioral evaluation.

The Summary Analysis Report resulting from the district's evaluation ultimately recommended a structured program, ei-

ther at the local Shorecrest High School or in an alternative public high school nearby, the Snohomish Discovery School. The report specifically rejected the possibility of residential placement for the student, finding that his learning disability did not require it. The report confirmed that based on his ADHD, C.S. qualified for special education under only the statutory category "health impaired," because "behaviors in school do not meet the criteria of Emotionally/Behaviorally Disabled, as his difficulties are not considered outside of common school discipline, and have only required normal (short term suspensions) discipline." Exh. D148, pp. 7–8.

On November 20, 2000, the district convened another IEP meeting to discuss the Summary Analysis Report and present the parents with the district's proposed options. During the meeting, the district presented the parents with information about the Discovery School. Another IEP meeting was held on December 4, 2000 in an effort to finalize C.S.'s IEP. In the following weeks, the parents' attorney communicated to the district that the parents would not accept any of the district's proposed options. The attorney highlighted the parents' belief that the district could not offer their son a successful program, and that none of the proposed options offered the residential placement that the parents believed necessary. The parents also indicated that they were reluctant to pull C.S. out of Montana Academy, a program they believed was having positive results.

## II. DISCUSSION

### A. IDEA Statutory Framework, General Provisions, and Remedies

The Individuals with Disabilities Education Act (formerly the Education for All Handicapped Children Act), was designed to ensure access of an estimated millions of

disabled children to "free appropriate public education" ("FAPE"). Under the Act, any state receiving federal funds must ensure provision of FAPE to every disabled child within its jurisdiction. The Act defines a "disabled child" as one

> with mental retardation, hearing impairments including deafness, speech or language impairments, visual impairments including blindness, serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities, who, by reason thereof, need special education and related services.

20 U.S.C. § 1401(a)(1)(A). FAPE is defined as

> special education and related services that
>
> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program [required elsewhere in this Act.]

20 U.S.C. § 1401(a)(8). The IEP is a presumptively annual, written statement designed by the disabled child's parents, teachers, local education agency, and in some cases, the child. An IEP must contain myriad prescribed data, including, *inter alia*, statements of the child's current performance, the child's measurable annual goals, the services and supplemental aids to be provided the child, and objective criteria for measuring the child's progress. 20 U.S.C. § 1414(d). The IDEA contains not just these substantive provisions, but procedural prescriptions as well, designed to ensure access of all disabled children to FAPE, including provision of certain timelines, and an enumerated right of parents to notice and an opportunity to be heard on issues concerning their child's education. The court will address in more depth each material substantive and procedural provision as it becomes relevant in the discussion below.

In the event a court determines that a disabled child has been denied FAPE in the public schools, IDEA authorizes a district court to provide such remedy as it deems necessary, including reimbursement for placement in a private facility. 20 U.S.C. § 1412(a)(10)(C). The court notes, however, that the IDEA does not require an "optimal" educational environment, merely one that is "appropriate." *See Board of Education v. Rowley,* 458 U.S. 176, 189, 197 n. 21, 198, 199, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Reimbursement for private placement is only required in cases in which (1) the public placement violated the IDEA, and (2) the private school placement was proper under the Act. 20 U.S.C. § 1412(a)(10)(C), *Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). A reviewing court should also bear in mind that educational agencies are instructed to develop IEPs for the "least restrictive environment" appropriate, a guideline a court should adhere to as well. *See* 20 U.S.C. § 1412(a)(5)(A), 1401(28); *see also* James A. Rapp, Education Law, Matthew Bender & Co., Inc. (2001) § 10.03[12][d][i] ("[E]ducational agencies must ensure that [t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions ... are educated with children who are nondisabled."). Residential placements (or reimbursement therefor) may sometimes be required in remarkable circumstances, but generally courts have found that FAPE is available in a less restrictive, local environment. *See generally* Rapp, § 10.03[1][h].

Finally, the IDEA provides that even after a child is placed in a private facility, the local educational agency will retain the responsibility, known as "child find," for ensuring the child's access to FAPE. 20 U.S.C. § 1412(a)(3).

### B. *The ALJ's Findings of Fact, Conclusions of Law, and Order*

The ALJ's Findings of Fact, Conclusions of Law, and Order contained three principal decisions. First, the ALJ concluded that the school district had denied C.S. FAPE from January 1997 through October 1999 (roughly half of sixth grade and all of seventh). The ALJ awarded the parents reimbursement for expenses incurred for tutoring and consultant services, a decision that is not challenged in this appeal. Second, the ALJ determined that the district was providing C.S. FAPE from October 1999 through the time his parents withdrew him from the district, on May 26, 2000. Finally, based on this conclusion and on a finding that after C.S. enrolled in Montana Academy he was no longer a resident of the district or of Washington for purposes of the IDEA, and that the parents had no intention to return C.S. to the district, the ALJ concluded that C.S.'s parents were not entitled to reimbursement for their unilateral placement of their child at Montana Academy. *See* FFCL, Order, at 73. The parents challenge all but the first of the ALJ's principal findings.

### C. *Standard of Review*

█ In general, the district court's inquiry in an IDEA appeal is twofold:

[f]irst, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obli-

gations imposed by Congress and the courts can require no more.

*Board of Education v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

█ The IDEA provides that "[i]n any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). This standard of review is not identical to the standard of review in other administrative cases. Instead, it has been characterized as "an intermediate level of review between traditional administrative review and *de novo* review." James A. Rapp, Education Law, Matthew Bender & Co., Inc. (2001), § 10.03[20][e][iii][C], citing *Lenn v. Portland Sch. Comm.,* 998 F.2d 1083 (1st Cir. 1993) ("the law contemplates an intermediate standard of review on the trial-court level—a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete *de novo* review."). Accordingly,

[t]he traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence, does not apply. This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole. Thus, ... federal courts cannot ignore

the administrative findings. Ultimately, however, the weight to be accorded administrative findings under the IDEA is a matter within the discretion of the federal courts. *Ash v. Lake Oswego Sch. Dist.,* 980 F.2d 585, 587–88 (9th Cir.1992). One factor influencing that discretion is how thorough were the administrative findings of fact and conclusions of law. *See Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir.1995). Another factor for consideration is whether the ALJ's findings are based on credibility determinations of live witness testimony. *See Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.,* 267 F.3d 877, 887–89 (9th Cir.2001). The court finds that the proceedings below—lasting approximately thirteen days, involving testimony of live witnesses, and summarized in a 73–page document—were thorough indeed, requiring that substantial weight be given the findings and conclusions of the ALJ.

While in some respects this appeal is similar to a summary judgment motion, it should be emphasized that the court is not bound by the same rules of summary judgment review found in Fed.R.Civ.P. 56(c). *See Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1472 (9th Cir.1993). In an appeal of an administrative decision brought under IDEA, a court may—indeed, in some cases must—review and decide genuine issues of material fact by a preponderance based on evidence in the record and any additional evidence offered by the parties, in addition to the findings of the ALJ.[4] A new trial to adjudicate issues of fact is not, therefore, necessarily required in an IDEA review, or "the work of the hearing officer would not receive 'due

weight,' and would be largely wasted." *Capistrano,* 59 F.3d at 891. Finally, in an appeal of the ALJ's decision, the party challenging the decision—in this case, the parents—bears the burden of proof. *See Clyde K. v. Puyallup Sch. Dist., No. 3,* 35 F.3d 1396, 1399 (9th Cir.1994).

### D. Whether the District provided FAPE prior to his removal from Kellogg Middle School in eighth grade

The ALJ made several findings regarding whether the district provided C.S. with FAPE prior to his removal from the public system. Specifically, the ALJ first concluded that the district denied C.S. FAPE for much of his sixth and all of his seventh grade year. The ALJ found that the school failed to follow certain procedures prescribed by the IDEA, including identifying C.S. as a disabled student, referring C.S. for special education evaluation, or notifying the parents of such a referral. The ALJ based this finding on the fact that the school was on notice of its obligation, based on its knowledge of C.S.'s poor grades, his ADHD diagnosis, and observations of his "off-task" classroom behavior. The ALJ then examined whether the district's failure to evaluate resulted in a loss of educational benefit, and found that although it was speculative whether a referral would have concluded that C.S. was qualified for special education or not, the procedural defects amounted to a denial of FAPE at that time. Based on this denial, the ALJ awarded the parents reimbursement for expenses they incurred in obtaining private tutoring and consulting services for their son. The school does not appeal this decision.

---

4. The court considered and rejected a request by plaintiffs to supplement the record with evidence that C.S.'s performance has improved at Montana Academy. The court found that in the event the ALJ's conclusion

that the district provided FAPE was overturned, then and only then would an examination of the appropriateness of the residential placement be at issue.

Having found a denial of FAPE in sixth and seventh grade, the ALJ then proceeded to evaluate the district's responses to C.S.'s academic difficulties in the eighth grade. The ALJ ultimately concluded that the district complied with the material procedural and substantive dictates of the IDEA during C.S.'s eighth grade. Having provided C.S. FAPE in eighth grade, the ALJ went on to find, the district was essentially "purged" of its earlier errors. The parents take issue with the ALJ's legal analysis, and with each individual conclusion on which she based her ultimate finding. Each is addressed in turn below.

**1. Did the District Deny FAPE During Eighth Grade?**

Although the IDEA provides a definition of FAPE, *see* 20 U.S.C. § 1401(8), the Supreme Court has found it necessary to fill in the contours of what it has called a "cryptic" definition. *See Rowley*, 458 U.S. at 188, 102 S.Ct. 3034. In particular, the Court noted the Congressional intent of "bring[ing] previously excluded handicapped children into the public education systems of the States and … requir[ing] the States to adopt *procedures* which would result in individualized consideration of an instruction for each child." *Id.* at 189, 102 S.Ct. 3034. The Court went on to observe that "[n]oticeably absent from the language of the statute is any substantive standard prescribing the level of education to be accorded handicapped children." *Id.* Instead, the Act provided a "basic floor of opportunity." *Id.* at 200, 102 S.Ct. 3034. The Court concluded that FAPE is provided if the finalized IEP is "reasonably calculated to enable the child to receive educational benefits." *Id.* at 206–07, 102 S.Ct. 3034.

The parents claimed before the ALJ and reiterate here on appeal that the district committed a series of procedural and substantive errors in development of the eighth grade IEP that they argue resulted in denial of FAPE during C.S.'s eighth grade year. Keeping in mind the Supreme Court's above-noted analysis of Congressional intent, the court will address each issue in turn.

**a. Evaluation of All Areas of Suspected Disability**

 Under IDEA's regulations, a child must be "assessed in all areas related to the suspected disability, including, if appropriate, health [and] social and emotional status." 34 C.F.R. § 300.532(g). A district's evaluation is held to a standard provided in the statute of "reasonableness." *See Rowley*, 458 U.S. at 205–07, 102 S.Ct. 3034. The IDEA does not prescribe substantive goals for an evaluation, but provides only that it be "reasonably calculated to enable the child to receive educational benefits." *Id.* at 206–07, 102 S.Ct. 3034; *see also Wexler v. Westfield Bd. of Educ.*, 784 F.2d 176, 182 (3rd Cir. 1986) (upholding a district court IDEA review evaluating "each challenged school board action to determine whether it was reasonable in light of the evidence").

The ALJ found that the district met its obligation under the IDEA to fully evaluate C.S. in all areas of his suspected disability. The parents argued below and on appeal that the district failed to evaluated C.S. in regard to his oppositionality. As discussed above and as summarized by the ALJ in the FFCL,

> In October 1999, the student was referred for special education due to problems in math, off-task class behaviors and talking, and poor work habits. In January 2000, the district received notification from Dr. Knutson, the student's psychiatrist, that the medical condition interfering with the student's education was ADHD. Dr. Knutson indicated that the medical implications this had for educational planning were poor organiza-

tional skills, lowered attention span and difficulty in focusing, exactly the same type of things that the district had been noticing for some time. The information provided by Dr. Knutson did not indicate that oppositionality was something that needed to [be] considered with regard to educational planning, even though oppositionality is considered a manifestation of ADHD according to the DSM–IV. This too was consistent with the district's understanding of the educational needs of the student, as the student did not have a history of acting in an openly defiant way at school. Any oppositionality that the student demonstrated at school was well within the description of ADHD alone. It was not unreasonable for the district to limit its evaluation of the student to the suspected area of ADHD given the student's history at school, and the lack of any different diagnosis from the student's doctor as of January 2000. The district's failure to evaluate the student for ODD or other social and behavioral problems was not in violation of IDEA procedures.

FFCL at 63.

In retrospect, of course, and with knowledge of the difficulties the parents were experiencing with C.S.'s increasingly aggressive and insubordinate behavior at home, one may be tempted to find error in the district's decision not to investigate further, beyond the report of C.S.'s longtime psychiatrist. This, however, is not the test prescribed by the IDEA. At the time, it was imminently reasonable to rely on the *child's own psychiatrist* for a diagnosis that fit exactly the symptoms the child was displaying at school, and related perfectly to the academic difficulties he was having. This finding is bolstered by the fact that the parents themselves approved the conclusions of the evaluation.

The ALJ also noted that the district performed a battery of tests on C.S., including "an intelligence assessment, an academic achievement assessment, observation by the school psychologist, a hearing and vision exam, review of medical records in the district's possession, . . . and an interview with the parents." *Id.* None of these inquiries revealed problematic oppositional behavior. The litany of testing was, under the circumstances, reasonable.

The parents argue that the district had a responsibility to conduct a thorough evaluation, an assertion which is at this point axiomatic. *See Seattle School District No. 1 v. B.S.,* 82 F.3d 1493 (9th Cir.1996). That obligation, however, is once again tempered by the obvious limitation that it be reasonable. *See Rowley,* 458 U.S. at 205–07, 102 S.Ct. 3034. The school could not be expected to ferret out any and all diagnoses or behavior that the parents and C.S.'s psychiatrist were in fact withholding, when all observable symptoms in the classroom were logically explained by the ADHD diagnosis and accompanying evaluation. This finding conforms with the age-old principle of science and logic, Ockham's Razor, which advises that the simplest, most obvious explanation is usually the correct one. Under these circumstances, the court finds that the district's eighth grade IEP evaluation complied with the requirements of the IDEA.

b. *Evaluation by Staff Knowledgeable About the Disability*

 The ALJ next addressed the parents' contention that the district's school psychologist and the school nurse were not qualified or knowledgeable about C.S.'s disabilities. The ALJ found that the parents failed to proffer any evidence in support of this contention. On appeal the parents complain that the ALJ inappropriately shifted the IDEA burden of proof to

them to show that the psychologist was unqualified. That is not the case; the ALJ simply found that under Washington law, given her position, she presumptively held a masters in school psychology, a qualification which appears, absent evidence to the contrary, to render her knowledgeable about C.S.'s disability. The parents have again failed to rebut this reasonable inference, and the court concurs with the ALJ's finding.

c. *Statement of the Disability's Impact on Progress in the General Curriculum*

█ The ALJ found that while the IEP's statement of C.S.'s disability's impact on his progress in the general curriculum "could have been better in addressing the student's condition[, t]he impact of this particular failure ... was minimal." FFCL at 64–65. While the statement included only reference to C.S.'s ADHD, and his difficulty with attention and focus in the classroom, therefore, the ALJ essentially found any deficit was cured by the IEP's comprehensive treatment of homework completion goals.

The parents on appeal offer no statutory, regulatory or judicial language that dictates the threshold level of comprehensiveness such a statement must meet. They argue only that "the ALJ misunderstands the nature of goals and objectives under IDEA[, which] do not substitute for understanding the causes of academic failure and addressing those causes with appropriate specialized instruction and related services." Plaintiffs' Memo at 29. They offer no authority supporting the notion that the statement of a child's disability's impact on general curriculum is intended to illuminate the "causes of academic failure" or "address those causes." The statutory requirements is simply that the IEP contain a statement of the disability's impact on performance in the general curriculum. The ALJ found this require-ment was met, albeit minimally. In the absence of authority demonstrating the insufficiency of the statement, the court will not disturb the ALJ's conclusion.

d. *Whether Procedural Shortcomings of the May 24, 2000 Meeting Resulted in Denial of FAPE*

Under the IDEA, an IEP meeting must be held in compliance with certain procedural measures, and failure to do so may result in a denial of FAPE. The ALJ found that the May 24, 2000 meeting was not in fact an IEP meeting, and that therefore any putative procedural shortcomings did not result in a violation of the procedural requirements for an IEP meeting mandated by the IDEA. Although the ALJ faulted Kellogg Middle School staff for failing to attend the meeting on May 24, 2000 as requested, she held that "the Shorecrest staff reasonably assumed that the meeting was to discuss the student's transition to high school and how his IEP, as written, would be implemented there." FFCL at 67. Based on the evidence, the court concurs with the ALJ's finding that the meeting was not an IEP meeting and therefore did not have to comply with the IDEA-dictated requirements.

The parents argue, apparently in the alternative, that it was a critical error for Kellogg's special education official, Dave Ostrer, to fail to notify Shorecrest and other interested officials that the parents had requested an IEP meeting. The ALJ found that this question was moot because a full-fledged IEP meeting would not have changed the course of the parents' actions. The ALJ found it likely that the parents still would have withdrawn the student from school to attend the wilderness course. The ALJ also noted that at the May 24 meeting, the father did not share the facts of C.S.'s At–Risk–Youth Petition or the assaults on his mother, and did not

indicate any dissatisfaction with the course of the meeting. The ALJ apparently concluded that the father would not have shared this information even if the meeting had complied with IDEA procedural requirements.

■ The court finds that the ALJ's conclusion, that the question was moot whether Ostrer should have called an IEP meeting, is not supported by the evidence. The question remains, then, whether the parents' request for a meeting triggered the district's obligations under the IDEA and whether Ostrer should have called an IEP meeting.[5] There is little evidence that supports such a contention. Under the IDEA, a district is required to "revise the IEP as appropriate to address any lack of expected progress toward the annual goals." 34 C.F.R. § 300.343(c)(2). The ALJ did find that the father requested a meeting to discuss the "student's transition to high school [and] whether the IEP would need to be changed," FFCL at 24, but it is not evident whether the father made it clear to Ostrer that he wanted to inquire about an immediate change to the IEP, or merely discuss whether a change would be feasible once C.S. enrolled in high school.

Given the subjects the father did eventually discuss at the May 24, 2000 meeting, a preponderance of the evidence supports the conclusion that it was reasonable for Ostrer to believe that the father simply wanted to discuss what options might be available once C.S. enrolled at Shorecrest. The principal issue the father raised was the possibility of a half-day tutoring pro-

gram for C.S. A reasonable interpretation of this discussion is not that the parents sought a revision to the IEP, but that they wanted to investigate possibilities for C.S.'s high school program. The IEP had been in place for only a few weeks. At a meeting with Ostrer in April, the father had not expressed any dissatisfaction with the IEP or requested any changes. The father did not request changes to IEP during the May 24, 2000 meeting and allowed the meeting to continue despite the absence of Kellogg staff. Under these circumstances, the court finds that the district's IEP obligations were not triggered by the father's request for a meeting, and that Ostrer's decision not to call an IEP meeting in May was reasonable, was not procedural error, and did not result in a denial of FAPE.

e. *Whether the Substance of the Eighth Grade IEP was Appropriate*

■ As discussed above, the basic question for an inquiry into the appropriateness of an IEP is whether it was "reasonably calculated" to provide educational benefit to the student.

The district's IEP team had determined that C.S. was having difficulty paying attention in class and completing assignments outside of class. To address this problem, the team developed a program by which C.S. would be required to maintain an organized system for his work assignments. The IEP also prescribed a system by which progress reports would be delivered to the parents. In addition, C.S. was

---

**5.** Federal regulations provide "[i]f a parent requests an IEP meeting because the parent believes that a change is needed in the provision of FAPE to the child or the educational placement of the child, and the agency refuses to convene an IEP meeting to determine whether such a change is needed, the agency must provide written notice to the parents of the refusal." Parents claim that the district is

required to hold an IEP meeting upon their request. The court was unable to locate authority for this proposition and the parents fail to demonstrate in any case that failure to hold an IEP under these circumstances constitutes a denial of FAPE, especially given that they removed their son from school a mere two days later, and never returned him to the district.

required to attend and bring materials to a study skills class, and was instructed to ask for help when needed and turn in all assignments. The district also included additional time in remedial math instruction, which C.S.'s evaluation revealed he required. It should be noted that the school initially recommended more time in the IEP study skills class, but that the parents requested less.

The IEP also contained, as required by the IDEA, a statement of C.S.'s current level of performance, noting his ADHD diagnosis, his math calculation and organizational deficits, and his failure to complete tasks. The IEP set certain goals and objectives, also as required by the IDEA.

C.S.'s poor grades and his ADHD diagnosis, in combination with his high IQ scores, revealed to the district that he was in need of special education. Analysis of his academic performance revealed that the only reason for his low grades was his failure to turn in assignments. C.S. was in fact scoring above average in his tests. Only his math test scores revealed that he had a particular need for remedial instruction in a substantive area. The ALJ found that the district responded to these data by developing an IEP that was reasonably calculated to provide C.S. with an educational benefit, namely, by imparting to him the importance of finishing assignments and the study and organizational tools to do so, and substantive remedial instruction in math. The court finds that the mandate of the IDEA, the record, and the ALJ's findings do not indicate that a higher "floor" of opportunity was required.

The parents' sole issue with the substance of the IEP is that it failed to address C.S.'s behavioral difficulties. As discussed above, and as found by the ALJ, the parents actively concealed these difficulties from the district until his eighth grade year, and even then muted the seriousness and extent of the episodes. Even after it learned of the home behavior problems, the district reasonably determined that C.S.'s academic difficulties stemmed from his failure to finish assignments and maintain organized work habits, not from his contumacious behavior at home. The IEP's "failure" to address C.S.'s relationship with his parents was not unreasonable given the knowable symptoms around which it was crafted.

### f. Timeliness of the Evaluation

 Federal regulations provide that once a student is identified as eligible for special education, an IEP meeting must be held within 30 days. 34 C.F.R. § 300, App. A, Question 18. The evaluation must be completed within a reasonable time after receiving parental consent. 34 C.F.R. § 300.343(b). Regulations further provide that once an IEP is developed, it must be implemented as soon as possible. 34 C.F.R. § 300.342(b)(2).

The ALJ found that the district received the student's referral for special education on October 25, 1999, and completed the IEP by February 17, 2000, undisputedly within a reasonable amount of time. The parents argued before the ALJ, however, that the delay of implementation of the IEP from its February 17, 2000 completion and March 24, 2000, when it was finalized, was procedural error amounting to a denial of FAPE. The ALJ noted that the delay was at the behest of the parents, who requested that the IEP not be implemented until the beginning of the trimester to temper the impact of the curriculum change on their son. Under these circumstances, the ALJ found, the delay was reasonable and was not procedural error. The court agrees.

The parents also appear to argue on appeal that the district's failure to "accelerate" the IEP process in eighth grade

was unreasonable given the C.S.'s "history of unaddressed needs, his increasing accumulation of behavioral incidents and academic failures, and the importance of mastering study skills in middle school in order to be prepared for high school." Plaintiffs' Summary Judgment Memo at 23. The record clearly reflects, however, that the parents failed to disclose—and in some cases, actively concealed—C.S.'s behavioral problems at home. The school was not aware of the disciplinary problems his parents were dealing with, let alone that these problems were "accumulating."

The ALJ found that the district denied C.S. FAPE in sixth and seventh grade, and the parents were awarded reimbursement for costs associated with that denial. The court finds that by eighth grade, however, the district was on notice of C.S.'s potential need for special education, and began its evaluation and the development and implementation of the IEP in a timely manner, reasonable under the guidelines provided by the IDEA.

2. *Did Denial of FAPE in Sixth and Seventh Grade Result in a Denial of FAPE "in a Timely Manner Prior to Enrollment" for Purposes of Reimbursement under IDEA?*

■ The ALJ essentially found that the district's provision of FAPE in eighth grade "purged the taint" of its denial of FAPE to C.S. in his sixth and seventh grades. The ALJ based this finding on regulations providing that parents may be entitled to reimbursement for unilateral placement in a private school if the district does not make "a free appropriate public education available to the child in a timely manner prior to enrollment" in the private school. 20 U.S.C. § 1412(a)(10)(C)(ii). The ALJ found that the denial of FAPE in sixth and seventh grade was "discrete" and did not carry over to C.S.'s eighth grade.

The parents argue that the ALJ's decision was made without the support of legal authority. The decision, however, is based on sound principles of statutory interpretation. The interpretation the parents seek could lead to the absurd scenario, for example, in which a child denied FAPE in second grade, who received FAPE throughout the rest of her primary education, would be entitled to reimbursement for placement in a private high school. The ALJ, and the court, reject this strained interpretation of the statute under the facts of this case. The district has atoned for its errors during the course of C.S.'s sixth and seventh grades by reimbursing the parents for private costs associated with his education during that time. The district furthermore, as discussed above, provided the student with FAPE prior to his enrollment at Montana Academy. Under these circumstances, the court refuses to hold that denial of FAPE during middle school indefinitely "taints" the district's efforts and renders it liable for expenses incurred at a private residential high school.

The parents add that denial of FAPE in sixth and seventh grades had a continuing, cumulative impact on C.S.'s academic performance in eighth grade. The parents argue that "time is of the essence" in a child's intellectual development. The court does not gainsay these contentions. What is clear, however, is that the statute does not provide that denial of FAPE at any time in a child's schooling may entitle parents to reimbursement for private placement some time in the future. The regulations support this interpretation by plainly providing that reimbursement is only available if the child is denied FAPE at the time of withdrawal, stating that a local education agency is not required to reimburse the parents "of a child with a disability [for placement] at a private school or facility *if that agency made*

*FAPE available to the child and the parents elected to place the child in a private school or facility."* 34 CFR § 300.403(a) (emphasis added).

The court finds that the district provided FAPE to C.S. beginning with its decision to evaluate him and develop an IEP under the IDEA in October 1999. This finding is consistent with the record and the ALJ's findings of fact and conclusions of law. The court also finds that because the district provided FAPE at the time the parents withdrew C.S. from the public system, they are not entitled to reimbursement for their unilateral decision to place him at Montana Academy. *Id.* An analysis of the appropriateness of placement at the residential facility is not, therefore, necessary.

### E. *Whether District Had a Continuing Duty to Evaluate Student After he Left Washington*

Under the IDEA, a district retains its "child find" duties—that is, to identify, evaluate and maintain an IEP designed to provide FAPE to a disabled student living in the district—even if the child is removed from the public system and placed in a private facility. *See* 34 C.F.R. § 300.125. The ALJ found that she did not need to address the question whether the district met this duty, however, because C.S. was no longer a resident of the district—or even of the state—subsequent to his placement at Montana Academy, thereby absolving the district of its responsibility to him under IDEA. The ALJ first concluded that a student's residency under the IDEA is determined by state law. The ALJ next found that as a matter of Washington state law, C.S. was a resident of Montana after starting school at Montana Academy.

On appeal C.S. argues that the ALJ incorrectly relied on state law in her decision, which should have instead been governed by federal law. C.S. argues in the alternative that Washington law provides that a minor's residency is determined by that of his parents.

### 1. *Whether Residency is Determined by State or Federal Law*

The ALJ chose to apply state law in her residency determination, a decision apparently based on language in a Department of Education Office of Special Education Programs memorandum discussing a district's obligation to meet child find responsibilities. That memorandum refers to state law for an IDEA residency determination analysis, which the ALJ relied on for the proposition that residency determinations under the IDEA are made according to state law. *See* FFCL at 69; Memorandum to Chief State School Officers, OSEP: 00–14, May 4, 2000, Question and Answer 11.

C.S. challenges the ALJ's conclusion that state law governs the residency determination in this case. Case law among the circuits does not provide an unequivocally uniform interpretation as to whether state or federal law should determine a child's residency under the IDEA. *See Joshua W. v. Union Sch. Dist. 259 Bd. of Educ.,* 13 F.Supp.2d 1199 (D.Kan.1998) (applying Kansas law in residency determination), aff'd 211 F.3d 1278 (10th Cir.2000); *Linda W. v. Indiana Dep't of Educ.,* 927 F.Supp. 303, 307 (N.D.Ind.1996) ("The parties agree that the IDEA leaves the determination of a student's residency to state law."), aff'd at 200 F.3d 504 (7th Cir.1999); *see also* Rapp, 10.03[9][c][ii] ("[Residency determination under the IDEA] is very dependent upon state law."); *but see Catlin v. Sobol,* 93 F.3d 1112, 1119 (2nd Cir.1996) (implicitly relying on interpretation of federal law to determine a residency question); *Wise v. Ohio Dept. of Educ.,* 80 F.3d 177, 182 (6th Cir.1996) (same). The only

Ninth Circuit case cited by the parties, however, appears to support the district's contention that residency determinations are made according to state law. In *Union School District v. Smith*, the Ninth Circuit relied, albeit implicitly, on California law to make a residency determination of a student. The parents argue that this case is inapposite because federal and California law were not in conflict on the matter decided. In the absence of unequivocal law to the contrary, however, the court finds this ruling persuasive, if not binding.

Plaintiffs argue primarily that reliance on state law for residency determinations is in contravention to Congress's intent to impose an obligation on the states to provide uniform education standards for individuals with disabilities.[6] This argument does not support the contention that federal residency law applies under the IDEA. In fact, the IDEA carefully avoids such standards or uniformity, instead charging states with uniform *procedural* obligations, to be fulfilled according to the individual state's—and indeed the individual local district's—particular methods. *See Rowley*, 458 U.S. at 189, 102 S.Ct. 3034. The court finds that whether C.S. is a resident of Washington for purposes of the IDEA is determined by state law.

2. *Whether C.S. is a Washington resident under State Law*

■ Having decided to apply Washington law and finding that the state's special education laws and regulations do not define residency for special education purposes, the ALJ relied on a Washington regulation on student transfers that provides

Student residence—Definition. As used in this chapter, the term "student residence" means the physical location of a student's principal abode—i.e. the home, house, apartment, facility, structure, or location, etc.—where the student lives the majority of the time.... The student's principal abode may be different than the principal abode of the student's parent(s).

WAC 392–137–115. In doing so, the ALJ noted that the above-quoted regulation had "historically" been used in the special education context in Washington, citing *In re Federal Way School District*, Special Ed. Cause No. 92–35, Memorandum and Order of Dismissal. *See* FFCL at 70.

In addition to the language cited above, a survey of child custody cases reveals that "residency" is used interchangeably with the child's "home," and is (obviously, as in custody cases the parents are generally in different homes) not synonymous with the parents' residence. Moreover, residency is commonly defined as "[t]he place in which one lives." American Heritage Dictionary (4th ed.2000). Absent some indication from Washington law that a minor's residency is defined differently, to wit, not as his own literal residency but, as a legal fiction, that of his parents, the court finds that a student's residency is just that: where he lives. A finding that C.S. did not reside within the district—or indeed within the state—is a logical one in this case, as illustrated by the difficulty the district has had in attempting to perform continuing evaluations of the student, made impossible by his absence from the area. Continuing responsibility for developing an IEP based on informed, first-hand obser-

6. Plaintiffs also rely on *Mississippi Band of Choctaw Indians v. Holyfield* for the proposition that "federal law controls determinations of domicile under federal statutes." Plaintiffs' Summary Judgment Memo at 37, citing 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). Plaintiffs' reliance is misplaced, as "domicile" and "residency" are markedly distinct legal concepts.

vations and evaluations should not logically fall on a district when the individual resides—that is, lives on a daily basis with no plans of returning in the immediate future—hundreds of miles away. The court finds that under Washington law, C.S. was not a resident of the state and that therefore the district did not have a continuing obligation under the IDEA to develop and maintain an IEP. An analysis of the district's efforts after C.S. enrolled in Montana Academy is not, therefore, necessary.

## III. CONCLUSION

For the foregoing reasons, the court concurs in the ALJ's principal findings of fact and conclusions of law. The district's motion for summary judgment is, therefore, granted, and plaintiffs' motion for the same is denied.